

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 1:22-cr-154 |
| ) | |
| CHARLES REGINALD "LUKE" MCDOUGALD ) | Count 1: |
| a/k/a "Bottom Boy" ) | Conspiracy |
| (Counts 1 and 2) ) | (18 U.S.C. § 371) |
| ) | |
| and ) | |
| ) | |
| ) | Count 2: |
| SHABORN AMAR "SHY" NESBITT, ) | False Official Statements |
| a/k/a "Mike Honcho," "The God I Am," ) | (18 U.S.C. § 1001) |
| and "Suge Thesenuts" ) | |
| (Count 1) ) | |
| ) | |
| Defendants. ) | |

SUPERSEDING INDICTMENT

October 2024 Term – at Alexandria

THE GRAND JURY CHARGES THAT:

At all times relevant to this Superseding Indictment:

GENERAL ALLEGATIONS

A. Animal Fighting Ventures and Dogfighting

1. The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment." It is illegal to sponsor or exhibit an animal in an animal fighting venture. It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture.

2. In the United States, dogfighting ventures almost always involve "pit bull"-type dogs, which dogfighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. Generally, a dogfight occurs when two dogs are released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

3. Because of their conditioning and training, dogs used in animal fighting ventures are almost always housed separately from other dogs—in pens, cages, or on chains—so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs used for fighting purposes to develop neck strength.

4. Generally, dogfighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dogfighters generally keep such dogs solely for fighting purposes.

5. Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dogfights are commonly found on the face and front legs, as well as on hind ends and thighs.

6. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

2

7. Once a dogfighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then typically undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine. Some of the drugs used include steroids to build muscle mass and aggression. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dogfighter's "yard" or indoors away from public view.

8. Generally, dogfighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. Individuals who own fighting dogs often try to maintain records of their dogs' success in fighting, at least partly because the offspring of fighting dogs can be sold at higher prices based on the documented success of the parents. One website on which dogfighters post pedigrees to demonstrate the fighting lineage of their dogs is https://www.apbt.online-pedigrees.com/. On this site, pedigrees are searchable by a variety of parameters and are routinely marked with codes to signify dogs' fighting results, such as "1XW," "2XW," "CH.," and "GR. CH.," which signify a one-time dog-fight winner, a two-time dog-fight winner, a champion, and a grand champion, respectively. "OTC" refers to fights that were conducted "off-the-chain"—that is to say, a less formal fight, conducted without the prior preparation of a "keep." "GIS" refers to an award for the most "game" dog in a particular card of dogfights.

B. The DMV Board

9. It can be challenging for dogfighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dogfighters rely heavily on each other and on extensive networks of contacts to find an opponent. The practice is known as "calling out a weight." Dogfighters often "call out a weight" to known dogfighters in several states to increase their odds of finding a match. "Calling out a weight" is often done over the internet, which is an instrumentality of interstate commerce.

10. Telegram is a multi-platform messaging application that can be downloaded on to iOS and Android devices.

11. To maintain contact with each other to discuss dogfighting, to exchange videos about dogfighting, and to arrange dogfights away from the view of law enforcement, the defendants and their conspirators created private groups on Telegram that they collectively referred to as the "DMV Board" or the "Board" (hereinafter, the "DMV Board"). The "DMV" designation referred to the common location of many members of the group in the District of Columbia, Maryland, and Virginia. The DMV Board had as many as 28 members at one time, and its members used the DMV Board to communicate about dogfighting with each other daily, often throughout the day.

12. The following defendants (whose names will hereinafter appear in bold font and capital letters) and unindicted conspirators were members of the DMV Board:

| Name | Alias(es) / Kennel Name | Hereinafter |
|---|---|---|
| Bashawn Allen | 425 | Allen |
| Larry Alston | Big Goon, Tha Goons | Alston |
| Charles Davis | Cat Daddy, Deep in the Game | Davis |
| Michael Hilliard | Roy, No Dayz Off | Hilliard |
| Eldridge Jackson | Big Head, 4B | Jackson |
| **CHARLES REGINALD MCDOUGALD** | **Luke, Bottom Boy Goons** | **MCDOUGALD** |

4

| SHABORN AMAR NESBITT | Shy, The God I Am, Mike Honcho, Suge Thesenuts | NESBITT |
|---|---|---|
| Ricardo Thorne | Rip, Darkside | Thorne |
| Dandre Wallace | Abstract | Wallace |
| Laron West | Frog, Get Sick | West |
| Charles Williams | Chucky, Never Say Never | Williams |
| Tarry Wilson | TJ, City Limits | Wilson |

## COUNT ONE
*(Dogfighting Conspiracy)*

1. The general allegations of this Indictment are realleged and incorporated into this count as though fully set forth herein.

2. From in and around March 2015, and continuing through in and about December 2022, in the Eastern District of Virginia and elsewhere, the defendants, **CHARLES REGINALD MCDOUGALD, a/k/a "Luke" and "Bottom Boy,"** of Dunn, North Carolina; and **SHABORN AMAR NESBITT, a/k/a "Shy," "The God I Am," "Mike Honcho," and "Suge Thesenuts,"** of Smithfield, North Carolina, did knowingly and unlawfully combine, conspire, confederate, and agree with one another and others, both known and unknown to the Grand Jury, to commit the following offenses:

   a. to sponsor and exhibit dogs in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(a)(1), and Title 18, United States Code, Section 49(a);

   b. to sell, buy, possess, train, transport, deliver, and receive dogs for purposes of having the dogs participate in animal fighting ventures, in violation of Title 7, United States Code, Section 2156(b), and Title 18, United States Code, Section 49(a); and

   c. to use instrumentalities of interstate commerce for commercial speech for purposes of advertising animals for use in animal fighting ventures, promoting and in other manners furthering animal fighting ventures, in violation of Title 7, United States Code, Section 2156(c), and Title 18, United States Code, Section 49(a).

<<

<<

## Ways, Manner, and Means of the Conspiracy

The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

1. It was a part of the conspiracy that the defendants and their conspirators bred, trained, and used pit bull-type dogs for dogfights.

2. It was a further part of the conspiracy that the defendants and their conspirators agreed to breed their pit bull-type dogs to one another's pit bull-type dogs in the hopes of producing champion fighting dogs.

3. It was a further part of the conspiracy that the defendants and their conspirators traveled to dogfights held at properties owned and/or arranged by themselves or other conspirators.

4. It was a further part of the conspiracy that the defendants and their conspirators bet on dogfights in which were entered dogs bred, trained, or owned by the defendants and their conspirators.

5. It was a further part of the conspiracy that the defendants and their conspirators used cell phones and direct messages to discuss dogfights, dogfighting, breeding fighting dogs, training techniques to maximize their chances of developing champion fighting dogs, and methods to avoid being caught by law enforcement.

6. It was a further part of the conspiracy that the defendants and their conspirators posted the names, photos, and lineages of their fighting dogs on websites that tracked pedigrees of fighting dogs.

7. It was a further part of the conspiracy that the defendants and their conspirators created and used the DMV Board as a place where they and their associates could exchange videos about dogfighting; discuss training techniques to develop successful fighting dogs; and arrange,

6

Case 5:24-mj-02410-JG    Document 1    Filed 10/30/24    Page 6 of 16

coordinate, watch, discuss, and bet on dogfights, all away from the view of law enforcement authorities.

8. It was a further part of the conspiracy that, on the DMV Board, the defendants and their conspirators used the names of their dogfighting operations and/or kennels to refer to themselves as well as to their dogfighting operations and/or kennels.

9. It was a further part of the conspiracy that the defendants and their conspirators used the DMV Board to discuss which dogfighters could be trusted to join the group, to circulate media reports about dogfighters who had been caught by law enforcement, and to discuss methods to minimize the likelihood that they would be caught themselves.

## Overt Acts

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the defendants and their conspirators committed overt acts including but not limited to the following:

1. On or about March 23, 2015, on a website tracking pedigrees of fighting dogs, a conspirator posted a modification to information about the fighting dog "City Limits Beans 1XW (OTC)" owned by conspirator Wilson, and characterized the dog as a descendant of "4B & Never Say Never's Gunner 1XW," a fighting dog jointly owned by conspirators Jackson and Williams.

2. On or about June 28, 2016, on a website tracking pedigrees of fighting dogs, a conspirator posted information for the fighting dog known as "City Limits (4B) Frazier," a fighting dog jointly owned by conspirators Jackson and Wilson.

<<

<<

<<

<<

7

3. On or about December 20, 2017, defendant **MCDOUGALD** participated in a dogfight with conspirators Wallace and Williams, as depicted in the photo below:



4. On or about October 30, 2018, defendant **NESBITT** asked the DMV Board on the Telegram app whether conspirator Thorne had a 41-pound male dog that Thorne wanted to fight for $5,000.

5. On or about January 1, 2019, on a website tracking pedigrees of fighting dogs, a conspirator posted information for the fighting dog known as "1XW Bottom Boys HoneyB" owned by defendant **MCDOUGALD.**

6. On or about January 2, 2019, defendant **NESBITT** told the DMV Board on the Telegram app that he "[j]ust won with three dogs. Got three dogs hooked right now too. Then when I get finished with those three, I have three more to hook. So whenever you get them weights, you just let me know."

7. On or about January 2, 2019, defendant **NESBITT** told the DMV Board on the Telegram app that **NESBITT** did not need advice from conspirator Thorne, because **NESBITT** had "been in the game for 15 years, bro."

8. On or about April 6, 2019, conspirators Williams and Hilliard drove through Fairfax, Prince William, and Stafford Counties along I-95 in Virginia, so that Williams could enter

8

a dog in a dog fight in Bunnlevel, North Carolina, against a dog belonging to defendant **MCDOUGALD.**

9. On or about April 6, 2019, in Bunnlevel North Carolina, defendant **MCDOUGALD** attended a dog fight that was refereed by defendant **NESBITT** and that involved a dog belonging to conspirator Williams, as depicted in the following photo:



10. On or about April 6, 2019, after a dog fight that lasted less than 10 minutes before being won by the dog belonging to conspirator Williams, defendant **MCDOUGALD** shot and killed the dog that lost the fight.

11. On or about June 27, 2019, defendant **MCDOUGALD** posted to the DMV Board an offer for a fight for a 36-pound female dog for $3000.

12. On or about July 2, 2019, defendant **MCDOUGALD** posted to the DMV Board an offer for a fight for a 52-pound male dog for $2000.

13. On or about July 8, 2019, defendant **MCDOUGALD** posted to the DMV Board an offer for a fight for a 31-pound female dog for $3000.

14. On or about July 10, 2019, in a private chat on the Telegram app, defendant **NESBITT** told conspirator Davis that **NESBITT** was interested in arranging a fight for a 39-pound male dog who already had won one fight.

15. On or about July 11, 2019, defendant **MCDOUGALD** posted to the DMV Board that he had arranged a fight for 31-pound female dog.

16. On or about July 20, 2019, defendant **MCDOUGALD** posted to the DMV Board an offer for a fight for a 36-pound female dog.

17. In a text message on or about July 22, 2019, conspirator known as "Boo" and "G-Code," asked conspirator Davis to tell defendant **NESBITT** to set up a dog fight with conspirator "Boo" / "G-Code."

18. On or about July 31, 2019, in a private message on Telegram, conspirator Davis notified defendant **NESBITT** that the DMV Board had been deleted from Telegram because a fighting dog of conspirator West had been seized by law enforcement the previous day at the property of conspirator Thorne.

19. On or about August 22, 2019, in a private chat on Telegram, defendant **NESBITT** discussed with conspirator Davis the possible sale to Davis of property in North Carolina so that Davis could keep fighting dogs in a location where Davis would not be bothered by law enforcement.

20. On or about August 24, 2019, defendant **MCDOUGALD** attempted to send $100 by CashApp to conspirator Davis.

21. On or about October 2, 2019, in a private chat on Telegram, defendant **NESBITT** asked conspirator Davis to sell **NESBITT** a fighting dog that Davis already had given to conspirator Wilson.

22. On or about October 21, 2019, defendant **MCDOUGALD** tied a pit bull dog to a treadmill to train the dog for a fight.

23. On or about November 11, 2019, defendant **MCDOUGALD** tied a pit bull dog to a treadmill to train the dog for a fight, as depicted in the following screenshot of a video of the training:



24. On or about December 30, 2019, defendant **MCDOUGALD** participated in a dogfight, as reflected in the following photo:



25. On or about March 11, 2020, defendant **MCDOUGALD** and conspirator Jackson witnessed a dogfight involving conspirator Williams, as reflected in the following screenshot of a video of the fight taken by conspirator Jackson:



26. On or about June 10, 2020, defendant **MCDOUGALD** sent $600 by CashApp to conspirator Jackson for a dog.

27. On or about August 12, 2020, conspirator Wilson possessed at his residence in Warsaw, Virginia, fighting dogs and videos depicting him engaged in dogfighting with conspirators Jackson, Wallace; Williams, and defendant **MCDOUGALD.**

28. On or about August 21, 2020, on a website tracking pedigrees of fighting dogs, a conspirator posted information for the fighting dog owned by known as "Goon Family's (Bottom Boy) Lil Sheba," owned by defendant **MCDOUGALD,** and represented to be a descendant of fighting dogs owned by conspirators Jackson and Wilson.

<<

<<

<<

<<

12

Case 5:24-mj-02410-JG     Document 1     Filed 10/30/24     Page 12 of 16

29.     On or about August 21, 2020, on a website tracking pedigrees of fighting dogs, a conspirator posted information posted for the fighting dog known as "Goon Family's (Bottom Boy) Big Boy," owned by defendant **MCDOUGALD,** the photo appended below:



30.     On or about September 6, 2020, on a website tracking pedigrees of fighting dogs, a conspirator modified information posted for the fighting dog known as "Goon Family's (Bottom Boy) Clyde," owned by defendant **MCDOUGALD.**

31.     On or about September 14, 2020, on a website tracking pedigrees of fighting dogs, a conspirator posted information for the fighting dog known as "Goon Family's (Bottom Boy) Jackie Brown," owned by defendant **MCDOUGALD.**

32.     On or about April 25, 2021, defendant **MCDOUGALD** sent $1000 by CashApp to conspirator Alston.

33.     On or about June 18, 2021, defendant **MCDOUGALD** received $1000 by CashApp from conspirator Alston.

34.     On or about July 14, 2021, on a website tracking pedigrees of fighting dogs, a conspirator modified information posted for the fighting dog known as "Goon Family's (Bottom Boy) Batman 1X," owned by defendant **MCDOUGALD.**

35.     On or about December 11, 2021, defendant **MCDOUGALD** attempted to send $1000 by CashApp to conspirator Jackson.

13

36. On or about December 14, 2022, defendant **MCDOUGALD** exchanged text messages with conspirator Jackson regarding **MCDOUGALD**'s possible purchase of the dog depicted below, in a photo texted by Jackson to **MCDOUGALD:**



(All in violation of Title 18, United States Code, Section 371.)

## COUNT 2

### False Statements

THE GRAND JURY FURTHER CHARGES THAT:

1. The Grand Jury realleges and incorporates by reference the General Allegations listed in this Superseding Indictment.

2. On or about July 15, 2024, in Manassas, Virginia, and elsewhere, defendant CHARLES REGINALD MCDOUGALD did knowingly and willfully make material false and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States. In specific, in response to questions posed to him by a special agent of the Federal Bureau of Investigation, MCDOUGALD:

   A. Denied being called or known as "Luke" or "Bottom Boy Goon;"

   B. Denied knowing individuals using the names Larry Alston or "Big Goon;" Eldridge Jackson or "Big Head;" Charles Williams or "Never Say Never;" or TJ Wilson or "City Limits;" and

   C. Denied use of or familiarity with the Telegram app.

3. The statements and representations specified above were false and fraudulent in that, as MCDOUGALD well knew, he used the names and was known to dogfighters on the DMV Board as "Luke" and "Bottom Boy;" and he engaged in communications on the DMV Board and in person at dogfights with Larry "Big Goon" Alston; Eldridge "Big Head" Jackson; Charles "Never Say Never" Williams; and TJ "City Limits" Wilson. The statements and representations specified above were material to the FBI's investigation in that the FBI was attempting to ascertain who had participated in a conspiracy to engage in dogfighting involving the "DMV Board" and the use of the Telegram app to communicate with other dogfighters; truthful answers to the questions posed to MCDOUGALD by the FBI would have led the FBI to ask MCDOUGALD about other

dogfighters and members of the DMV Board known to MCDOUGALD that had yet to be identified and arrested.

(In violation of Title 18, United States Code, Section 1001(a))

A TRUE BILL:

FOREPERSON

Jessica D. Aber
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney